J-S57031-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: Q.R.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.M., MOTHER | No. 1038 EDA 2015 |

Appeal from the Decree entered March 9, 2015,
in the Court of Common Pleas of Philadelphia County, Family
Court, at Nos: CP-51-AP-0000565-2014,
CP-51-DP-0002014-2012

BEFORE:  MUNDY, OTT, and STABILE, JJ.

MEMORANDUM BY STABILE, J.:                    **FILED OCTOBER 21, 2015**

T.M. (Mother) appeals from the decree entered March 9, 2015, in the Court of Common Pleas of Philadelphia County, which terminated her parental rights to her minor daughter, Q.R.M. (Child), born in May of 2010.[1] We affirm.

The trial court summarized the relevant factual history as follows.

> . . . . On November 5, 2012, Child's Mother went to the Department of Human Services ("DHS") and stated that she did not have heat in her home and used an oven to heat her home. Mother also stated that she was [being] evicted from her home because she owed $1,400 in unpaid rent and Mother voluntarily placed her Child with her maternal great aunt [(Foster Mother)] on November 5, 2012.  On the same day, DHS visited [Foster Mother's] home and conducted a safety assessment.  DHS also performed Child Line and Pennsylvania State Police clearances. [Foster Mother's] home was deemed appropriate and she was cleared.  [Foster Mother] was willing to continue to care for the Child.  On November 6, 2012, DHS obtained an order for

---

[1] The parental rights of Child's putative father, H.A., as well as the parental rights of any unknown father that Child may have, were terminated by separate decrees entered that same day.  Neither H.A., nor any other alleged father, is a party to the instant appeal.

protective custody ("OPC") for the Child. On November 8, 2012, at the Shelter Care Hearing, the OPC was lifted and the temporary commitment to DHS was ordered to stand. The Child remained with [Foster Mother], and Mother was awarded weekly visitation with her Child at [Foster Mother's] home. On November 15, 2012, the Child was adjudicated dependent and fully committed to DHS. . . .

Trial Court Opinion, 6/2/15, at 1.

On October 21, 2014, DHS filed a petition to terminate Mother's parental rights to Child involuntarily. A termination hearing was held on March 9, 2014, during which the trial court heard the testimony of DHS social worker, Diane Solice; DHS social worker, Melissa Howard; Lutheran Children Family Services employee, Marjorie Gibbs; and Mother. Following the hearing, the court entered its decree terminating Mother's parental rights. Mother timely filed a notice of appeal on April 8, 2015, along with a concise statement of errors complained of on appeal.

Mother now raises the following issues for our review.

A. Whether the trial court committed reversible error when it involuntarily terminated [M]other's parental rights where such determination was not supported by clear and convincing evidence under the Adoption Act 23 Pa. C.S.A. §2511 (a)(1), (a)(2), (a)(5), and (a)(8) as [M]other made progress towards working and meeting her [Family Service Plan] goals?

B. Whether the trial court committed reversible error when it involuntarily terminated [M]other's parental rights without giving primary consideration to the effect that the termination would have on the developmental physical and emotional needs of the child as required by the Adoption Act 23 Pa. C.S.A. §2511(b)?

Mother's Brief at 2 (trial court answers omitted).

We consider Mother's claim mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

- 3 -

In this case, the trial court terminated Mother's parental rights pursuant to Sections 2511(a)(1), (2), (5), (8), and (b). We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under Sections 2511(a)(1) and (b), which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> > \*\*\*
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(1). To

meet the requirements of this section, "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citing *In re Adoption of R.J.S.*, 901 A.2d 502, 510 (Pa. Super. 2006)). The court must then consider "the parent's explanation for his or her conduct" and "the post-abandonment contact between parent and child" before moving on to analyze Section 2511(b). *Id.* (quoting *In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1998)). This Court has emphasized that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child." *In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (quoting *In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003), *appeal denied*, 859 A.2d 767 (Pa. 2004)). Rather, "[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *Id.* (citation omitted).

Instantly, the trial court found that Mother evidenced a settled purpose of relinquishing her parental claim to Child during the relevant six-month period, and that Mother failed to perform parental duties. Trial Court Opinion, 6/2/15, at 6. The court reasoned that Mother did not complete her Family Service Plan (FSP) objectives. *Id.* at 4-6. Specifically, Mother did

not visit with Child consistently, and failed to obtain appropriate housing for Child. *Id.*

Mother argues that she did visit with Child consistently, and that she "exhibited a genuine effort" to be reunified with Child. Mother's brief at 5. Mother also suggests that she made efforts to obtain appropriate housing for Child, but that she was unable to obtain housing due to her lack of income. *Id.* at 5-6.

After a thorough review of the record in this matter, we conclude that the trial court did not abuse its discretion by involuntarily terminating Mother's parental rights to Child. Ms. Marjorie Gibbs testified that she is employed at Lutheran Children and Family Services, and that Child has been her client since March of 2013. N.T., 3/9/15, at 48. Ms. Gibbs explained that Mother initially was offered unsupervised weekly visits with Child in the community. *Id.* at 49. It was Mother's responsibility to call the foster family and let them know that she was coming to get Child. *Id.* However, there were "a couple of issues after a while, and the [foster family was] complaining," so Ms. Gibbs requested that Mother call her to schedule visits instead. *Id.* at 49-50. Following this adjustment, which took place in, approximately, the summer of 2013, Mother attended her visits with Child only once every other month. *Id.* at 50. Mother later was limited to monthly supervised visits with Child, as a result of a visit which took place over Memorial Day weekend in 2014.[2] *Id.* at 51-52. During that visit,

---

[2] Memorial Day occurred on Monday, May 26, 2014.

Mother took Child to Red Lobster, and did not return her to the foster home until approximately 11:00 p.m. *Id.* at 51-52. Mother had only one visit with Child after Memorial Day weekend of 2014, which occurred on January 17, 2015. *Id.* at 52-53. The visit was scheduled for two hours. *Id.* at 53-54. Mother arrived a half-hour late, and left after only thirty or forty minutes. *Id.*

DHS social worker, Melissa Howard, testified that she was assigned to this case on November 3, 2014. *Id.* at 61. Ms. Howard explained that she discussed the importance of visitation with Mother. *Id.* at 63. However, Mother reported to Ms. Howard that she did not want to have supervised visits with Child because she never had supervised visits before, and because she did not understand why visits needed to be supervised now. *Id.* In addition, when Ms. Howard brought up Mother's approaching termination of parental rights hearing, Mother stated that she did not care, because she knew that Child was in good hands with Foster Mother. *Id.* at 63-64, 68-69.

Mother testified that she visited with Child weekly when Child first was placed in foster care. *Id.* at 78, 81. Mother claimed that she began visiting once per month, or once every other week, when Ms. Diane Solice became Child's DHS social worker.[3] *Id.* Mother explained that she visited less frequently because Ms. Solice "was saying that they needed to have a set

---

[3] Ms. Solice was assigned to Child's case from October of 2013 until August 18, 2014. N.T., 3/9/15, at 5.

schedule" for visitation. *Id.* at 79. When asked why she could not stick to a set schedule, Mother stated, "Well, at that time I was staying up in Bensalem, and that was around the summer time, and just like I said I was going through some things and I didn't go se[e] [Child] because I was having emotional, you know, feelings." *Id.* at 79. Mother also reported that Child became upset and the conclusion of visits, "because she couldn't come with me. . . . and every time I would see my daughter crying it would make me cry or it would hurt me and I didn't want to feel like that." *Id.* at 80.

Additionally, testimony was presented concerning Mother's failure to obtain appropriate housing. The trial court summarized this testimony as follows.

> DHS made reasonable efforts to help Mother in obtaining housing. Mother was referred to a program for single wom[e]n called "Achievability", but Mother stated that she did not qualify due [to] the fact that she lacked a General Education Development diploma ("G.E.D.") or high school diploma. However, the record established that the "Achievability" program would have helped Mother obtain a G.E.D. Subsequently, Mother was referred to a program called "Tenants Rights". This time Mother stated that she could not be enrolled in such a program due to her bad credit. [The] DHS social worker informed Mother that attendance to a mental health program would allow her to obtain housing through a Shelter Care Plus program, but Mother did not comply with [the] DHS social worker['s] advice. Mother was enrolled at "Interim House" twice. DHS made efforts to persuade Mother to remain at this program, as it is one of the best in assisting single women. Still, Mother abandoned it. Mother was hospitalized at Belmont twice but again she did not stay. DHS made efforts to convince Mother to return to "Interim House", which Mother accepted. However, Mother abandoned the program again, arguing that it did not work. DHS informed Mother that they were willing to reunify her Child with her even if she did not obtain housing

through a realtor, but through a friend who would allow her to move in without any background checks or credit history. Mother found a very large apartment and DHS was willing to inspect the location. [The] DHS social worker then set a date for a home evaluation, but Mother prioritized a birthday party for her sister over her appointment with DHS. Mother was also recommended to go to a Wom[e]n Against Abuse shelter, but she was reluctant to do it. When she did go to the shelter, Mother was discharged on January 15, 2015, due to her non-compliance and breaking confidentiality rules. On February 28, 2015, Mother was living with her boyfriend in a one-bedroom apartment. No clearances or home evaluation was carried out due to the fact that Mother did not provide any information about her boyfriend or her lease. Mother's housing still remains an incomplete objective since the development of the original FSP.

Trial Court Opinion, 6/2/15, at 5-6 (citations to the record omitted).

Accordingly, the record confirms that Mother refused or failed to perform parental duties for a period of at least six months prior to the filing of the petition to terminate her parental rights on October 21, 2014. Prior to Memorial Day weekend of 2014, Mother visited with Child only rarely. Following Memorial Day weekend, Mother did not visit with Child at all until January of 2015. Mother provided no explanation for this failure to visit with Child, other than the fact that she was "having emotional . . . feelings," and did not like seeing Child cry. Moreover, the record supports the trial court's conclusion that Mother did not obtain appropriate housing, despite the efforts of DHS. Mother has failed to display even a passive interest in Child, and she is not entitled to relief.

We next consider whether the trial court abused its discretion by terminating Mother's parental rights under Section 2511(b). We have discussed our analysis under Section 2511(b) as follows.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

In this case, the trial court concluded that Child is bonded with Foster Mother, that Mother and Child do not share a parent/child bond, and that Child will not suffer irreparable harm if Mother's parental rights are terminated. Trial Court Opinion, 6/2/15, at 9. Mother argues that she is

bonded with Child, and that the trial court failed to conduct an adequate analysis of Child's emotional needs. Mother's brief at 7-8, 10.

We again conclude that the trial court did not abuse its discretion. Ms. Gibbs testified that Child was happy to see Mother during their most recent visit on January 17, 2015 and that the visit went well. N.T., 3/9/15, at 53, 54. Child refers to Mother as "mom." *Id.* at 59. However, Ms. Gibbs opined that Mother and Child do not share a parent/child bond, and that terminating Mother's parental rights would not cause irreparable harm to Child. *Id.* at 57, 94-95. Ms. Gibbs explained that Child "knows [her foster parents] as her parental figures, and I know that she looks to them for everything . . . ." *Id.* at 57. Child has a strong bond with Foster Mother, and is attached to the entire foster family. *Id.* at 54-55.

Thus, the record supports the trial court's conclusion that it would best serve Child's needs and welfare to terminate Mother's parental rights. Child is bonded with Foster Mother, who has cared for Child since November of 2012. Moreover, Child has seen Mother only once since Memorial Day of 2014. While Child refers to Mother as "mom," and while Child was happy to see Mother during their most recent visit, it is clear that any remaining bond between Mother and Child is outweighed by Mother's unwillingness to parent Child, and by Child's need for permanence and stability. *See C.D.R.*, 111 A.3d at 1220 (concluding that the appellant mother's bond with C.D.R was outweighed by the mother's "repeated failure to remedy her parental

incapacity," and by C.D.R.'s need for permanence and stability). No relief is due.

Accordingly, because we conclude that the trial court did not abuse its discretion by involuntarily terminating Mother's parental rights to Child pursuant to Section 2511(a)(1) and (b), we affirm the decree of the trial court.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/21/2015